The Honorable Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. I'll take the United States and this Honorable Court. Please be seated. Good morning and welcome to the Court of Appeals. We have one case. We're ready to proceed with our to begin with the commons. The commons. Caymans. Thank you, Your Honor. Good morning and may it please the court. Twenty years after Dr. Al-Timimi's trial, it is now clear that his speech in the days after September 11, 2001, do not provide a basis for criminal liability. I want to begin my argument by discussing the Supreme Court's opinion in Rosemond v. United States. But before doing that, I want to mention three arguments that the government's blue brief does not respond to. The red brief, sorry. First, as to count two, solicitation of a crime of violence. We argued at pages 80 through 83 of the blue brief that the elements of living war, assembly of men, is not categorically a crime of violence. And the government at pages 58 through 64 of the red brief does not respond to this argument. It thus abandoned any argument against making that count. Nor does the government respond to the standard overview with respect to speech that may be protected by the First Amendment, which is de novo. Nor does the government respond to the fact that what it describes as a Pinkerton instruction was actually a verbatim co-conspirator acts and statements instruction that was provided to the jury in the context of evaluating witness testimony, not a theory of criminal liability. With respect to Rosemond, in order to establish aiding and abetting liability in the context of a 924C charge, an accomplice must have actual foreknowledge that the principal will use or carry a firearm. And the jury instructions must require proof of actual knowledge. The same is true as the government concedes with respect to carrying explosives in violation of 18 U.S.C. 844H. In this case, Mr. Altamimi faces consecutive sentences of 10 years on count 9 and 20 years on count 10. But the instructions didn't require knowledge that the principals would carry explosives. They only required knowledge. So all the other sentences for the other remaining offenses have been served, but your focus is on all of the crimes, not just on count 9 and 10. That is true. The Rosemond argument is specific to counts 9 and 10, but we do challenge the convictions on all counts. Specifically with respect to the evidence relating to aiding and abetting and whether the speech that was the principal focus of the trial was protected by the First Amendment. Because the government failed to meet the aiding and abetting elements on each of the counts that involved aiding and abetting because the Supreme Court has said that speech is not enough to commit to that there must be some further act, which there was not here. Well, let me be clear about our argument on speech. But first, count 2 is a separate charge of solicitation. And so we challenge that on sort of slightly different grounds. But all of the other liability were aiding and abetting. And so our argument is not merely that speech. Yeah, I shouldn't have used the words speech. I'm not meaning to implicate the First Amendment here, but go ahead. What I meant to say is that speech that provides help, even if it is just speech that gives instructions, for example, about how to file a false tax return or something like that, we agree with the government that that certainly can satisfy aiding and abetting. But the speech has to be more than mere words or what the cases call pure speech or simply inspirational words. And that was the basis for the government's prosecution in this case. Can I ask you a question about this? So the district court instructed the jury on this, right, without objection. And I don't think you're challenging the instructions now. And the district court said that counseling and inducement and encouragement could be enough. And that's not contested, right? So there were general instructions about aiding and abetting, listing all of the verbs and including counseling. We do say that those words have to be understood in the light of the old soil that came with the common law definition. But it's sort of tricky, right? Because you're raising kind of a legal argument about the scope of what counts, but you're not disputing the instructions. So don't we end up with just kind of a straight sufficiency situation? Well, let me be clear. We are challenging the instruction with respect to 9 and 10, because there were general- Yes, I know on 9 and 10. I'm sorry, just on aiding and abetting. On this point, whether words that don't provide kind of a more concrete assistance beyond encouragement or inducement are enough. Yes. In terms of what does Rosemond and all the other cases that talk about what aiding and abetting requires, is that supported by the record in this case? And so in this case, essentially, the government points to primarily, I think, a lunch meeting on September 18th, in which Dr. Al-Tamimi met with individuals Kwon and Ahsan. And at the meeting, he said, they told him they're going to Pakistan or L.E.T. And he said, carry a magazine, travel separately, and cry like a baby if you get caught. And we acknowledged that the level of the affirmative act is fairly low. So in Rosemond, they said, you just have to do something to assist in one or another element of the offense. And then in Hanson, didn't the Supreme Court further give guidance on what counseling and encourage? It did in the context of 8 U.S.C. 1324, which actually prohibits encouraging an individual to violate the immigration laws. But it certainly tried to distinguish between First Amendment protected speech, which is sort of the general understanding of what encourage means. I guess what I'm getting at is, in Hanson, I'm read Hanson to actually support your argument that even the words counseling and encourage mean facilitate, because they're terms of art in the criminal law context. Exactly. And so Hanson says, you got to apply the old soil, I think, in that case. And you have to look at the common law meeting. And it always had required facilitation or assistance. I think in the briefing below, the government was trying to distinguish aiding and abetting from some other type of liability through these other words in 18 U.S.C. Section 2. But we know that all aiding and abetting requires is assistance and facilitation. And once you start to suggest that aiding and abetting can be accomplished merely through words of encouragement, as that is commonly understood, then you run into a First Amendment problem. And so the problem that we have is that the case law is somewhat contradictory, as this court said in Miscellus. Encouragement is a very capacious word. But we know that as the Supreme Court has said in the case of Ashcroft, that mere encouragement of another to violate the law is not a sufficient reason for banning it. And so then, what does that mean in the context of aiding and abetting? Well, it means that we have to cabin or constrain aiding and abetting to its traditional understood meaning of an affirmative act that helps or facilitates. And we cited in our reply brief this case from the Second Circuit, Delgado, which is a 2020 case. It's after Rosemond. And in that case, the Second Circuit reversed a conviction for a defendant who was part of a gang, and the gang retaliated against another gang and shot and killed two bystanders. And the defendant in that case handed a gun, but it wasn't a working gun, to one of his Confederates. And the other gang member went to the shooting, and it didn't fire. It didn't work. And the Second Circuit said, that's not enough for aiding and abetting. We realize the bar is low, but it has to contribute whatever the accomplice does. It has to contribute to the success of the offense of conviction. You know, it seems to me, at least a core concern or core argument that follows as a common thread in all of these is the First Amendment. It being the question of, is this protected or unprotected? Does it fit within Brandenburg? Does it fit within the solicitation or other? And it seems to be common with all of them. And articulate on that if you think that's the case. I think that's absolutely true. And so here's what I'll say about Brandenburg and incitement. So there are, there is a specific context in which mere words of encouragement can be the basis for criminal liability. And that's incitement. So for example, if there is a crowd of people around a jail, and an individual stands up and says, go and lynch that prisoner. That's an example in the- Speak specifically to the charges here, and the things that you articulate, only a remoteness of it, and the questions of whether crimes are committed for solicitation, that sort of thing. So outside of that context, outside of that immediate context, it is protected speech. So there is, I think, even in civil liability, cases where an individual is about to beat up somebody else, and a bystander says, do it, hit him. If you're right there and encouraging, that's incitement. And that can result in criminal liability. But outside of that context, if you were advocating that individuals join disfavored groups, the communists, or the Black Panthers, or Antifa, generally, that's abstract encouragement that is protected. Just so I understand, I mean, I do find our law on this a little bit, maybe circular is the right word, but if it's aiding and abetting, it's sort of per se, outside the First Amendment, and it doesn't matter if the unlawful activity is imminent under Brandenburg. Agreed. Okay. Absolutely. So we start, once we're past, this isn't enough for aiding and abetting, then we're talking about the First Amendment. Absolutely. And the vast majority of aiding and abetting cases are about conduct, and deeds, and not speech. And so there are certain- But also, that lunch on the 19th, I assume you would agree, that had the defendant maybe been more specific, given more advice about how to avoid detection, at some point, those words would have amounted to aiding and abetting, and then per se, been outside the First Amendment. I think that's fair. I think the government would have to come forward, likely, with some evidence to say, well, this information that he provided actually would have obstructed our ability to identify these individuals, or would have hindered our investigation. There would be something- It has to be good advice? Well, I'm just saying that there could be other evidence the government could adduce to say this is valuable. But does the government have to do that? If somebody gives very specific advice, like here's how to get away with tax fraud, and it just turns out to be wrong, it's not helpful, that's not aiding and abetting? I guess it would be like attempted aiding and abetting. So aiding and abetting requires someone to actually commit the crime. Yeah. But assume he did get away with it, but it had nothing to do with this advice. So if you provide advice that's ineffective, tangential, or doesn't result in the commission of the crime, I don't think it can be aiding and abetting. So if I am out there giving advice about how to evade the tax laws, it's just wrong and nobody follows it, I can't be found guilty of aiding and abetting unless somebody tries to follow it and then commits the crime. So the problem with the advice on the 19th, like how to avoid detection, why was that not aiding and abetting? It's not aiding and abetting because it didn't contribute to the success of the crime, and it was so tangential. I mean, we're talking about a 30-year sentence on counts 9 and 10 for information where even the government, and I wanted to cite the- They didn't, there's no indication they used any of that advice, is there? That's true. And in the government's post-trial briefing on Joint Appendix 2897, they admitted that proof did not establish that Tamimi significantly aided and abetted anyone to reach the L.E.T. camps. And so even under their own view, this was not a case about aiding and abetting. They said nothing about that meeting on the 18th in their closing argument except that it showed that this was something they had discussed earlier, the trip on the 16th. And so they said nothing about, well, this establishes aiding and abetting. This was a trial about prosecuting a person for inspirational words. Well, what about, can you, in the time you have, talk about the solicitation aspect? That's something different from aiding and abetting, isn't it? Doesn't it require less? Well, solicitation does not require someone to commit the crime. So if I solicit someone to burn down my business for insurance proceeds or to kill my spouse, it doesn't matter whether anyone actually does that. It doesn't matter if I'm speaking to an undercover agent. The words themselves can result in criminal liability. But because of that, it really requires a specific concrete proposal with an intent to have that crime be committed. And so the legislative history on 373, it says that typically this requires a proposal, a concrete proposal for a hiring or partnership arrangement. Well, I mean, what about, couldn't his, the conversations in the apartment at that dinner where he appeared to be persuading the people there to go fight alongside the Taliban. I mean, he even used the words fight. The word fight. So I'm not sure that that's borne out by the record, but let's assume for the moment that he did, I would say that the only context in which that can constitute solicitation is if the person is like a mob boss. So a mob boss telling a subordinate, you need to do this, or a follower, you need to do that. That's why the government keeps calling these individuals followers. What does Mujahideen mean? Mujahideen? We've defined it in the briefs. It means a soldier, I think, of a group, non-governmental organization, one of these rebel groups. And what do soldiers do? Well, fair enough. They can fight or they can protect. Okay, go ahead. So I don't mean to belittle the argument, if I can just respond in the 15 seconds I have. All we're saying is that this was not a concrete, specific proposal that meets the level of solicitation, which requires generally a proposal to partner or hire or direct a subordinate. This was merely a teacher. This was not someone who had followers. Teachers have followers. I'm sorry? Teachers have followers. Does it matter that they did it? I mean, as you point out, a lot of these solicitation cases are cases where nobody does the thing because they're talking to an undercover agent or something. I mean, here, they turned around and they did it. Does that count as evidence? I think it could. I would note that the conspiracy for these individuals to go overseas and fight had long predated and had no relation to Dr. Al-Tamimi. I think their agreements show they were all trying to engage in this conspiracy back from 2000. Nothing to do with Dr. Al-Tamimi. One of the individuals, Aitik, had already bought his ticket, had a letter of introduction from a Mr. Royer to get to the L.E.T. camps. Can it be relevant? Yes, absolutely. But in this case, what we're talking about is persuasion, and it doesn't matter if someone, that is, let me say, for purposes of the First Amendment, is prohibited. If it is mere persuasion, and if it is not in the context of incitement, then it is protected. Regardless of whether an individual says, I am really persuaded to go engage in a riot or do some other violation of the law that the speaker says they should do, it remains protected unless it constitutes a concrete proposal to hire or partner or direct a subordinate to kill a rival gang member, for example, or it provides assistance. Thank you. We have some time left for rebuttal. We'll hear from Mr. Holmberg. I think your honors were very astute in focusing on what Tamimi said on September 19th at the lunch. He said, let's meet for lunch, and not only did he say cry like a baby and act like you're going to a wedding, but he also said, if Kwan, if Kwan, you get pulled off, Hassan, you keep going, because you can make it to Pakistan, you know Urdu, and you can get to L.E.T. None of that sounds like facilitating a crime or aiding and abetting a crime, which requires facilitation, at least to me, and I didn't see the government's briefing really grapple with the Supreme Court precedent on that. What is your strongest evidence of appellant committing something in furtherance of the offenses here? The first thing is, at the September 16th, he said, the way to join the Mujahideen is go to L.E.T. They're the right group. Royer can put you in touch with L.E.T. And there is evidence that he knew what L.E.T. was and what they did. There's gobs of evidence that he knew about that, but I think that you may be looking at this the wrong way in the first place. The Brandenburg test, if the Brandenburg test applies here, because, I mean, we say that solicitation and aiding and abetting are outside of it, but putting that aside, let's say the Brandenburg test applies to Tamimi's speech. It was not abstract. It was not, I believe in the moral propriety of supporting the Taliban. It was, go join L.E.T. to get training to fight for the Taliban. It was not, I believe that you should all engage in jihad someday, somewhere. And that might be solicitation, but how is it aiding and abetting under the Supreme Court precedent? When you induce someone because you are telling them to go. If Tony Soprano says, go do it. Specifically, what was he telling them to do? He was telling them to leave the country, join the Mujahideen, and go fight in either Afghanistan, Pakistan, or Chechnya, Russia. There has to be some facilitation. Hansen said, in Hansen, the Supreme Court equated encourage and induce to facilitate, the same as aiding and abetting, the same as Rosamond and every other Supreme Court case to look at Section 2 said. So how did he facilitate other than with his, those words? Because if those words are enough, I can think of an example of aiding and abetting that might occur here in the United States. What if somebody, what if a large group of people, angry at Congress, gathered on the Washington Mall, some of whom have firearms and are known to have firearms, and a leader stood in front of them, here, right in front of them, not in another country, and said, go down the street and fight like hell, I'll be there with you. Does that fit aiding and abetting? I don't know the answer to that, but I will say. Well, it certainly sounds like what you just said. I will say that to me. You just said he told him to go and fight. To me, he said many times in public, Jihad is the pinnacle of Islam. But on September 16th, he said, don't anybody repeat what I'm telling you. Close the shades, turn off your phones, turn off the answering machine. This is something you must never be repeated. He knew he was saying something different. It wasn't abstract advocacy. I think the heart of where we are is, and I do think it's important to be able to indicate in the first instance that this is not protected speech. If it's protected speech, we're in a different realm. So it's not just a side thing to think about whether a random or illegal solicitation applies. To me, that's the basis for the government's argument is it has to be unprotected speech in the first instance. But beyond that, the question that seems to be where Judge Thacker is going is, when does it leave the realm of mere advocacy for criminal conduct to where it actually becomes criminal to do it? The advocacy of it just alone does not do it. And you have an instance where it was so unfortunate that the context of this, you've got 9-11 that we are sensitized beyond belief, rightly so, afraid as a country in so many ways that this is going on. They meet, and I'm not sure they're doing anything they haven't been doing in a whole while, but that context puts it differently. But what's being said here is very, it seems remote as to what actually happens. He doesn't directly tell them to go. And when he says go to Lett, well, Lett's all over Pakistan, that presence in Pakistan of Lett. He was telling them, to go get training at Lett, because Lett was known for providing training so that you could go to Afghanistan to fight. That was the plan. They would have ended up in Afghanistan, but Lett stopped them because the war ended. Now, we know in retrospect that they were there to do that. Maybe two individuals went somewhere. So there were four that went. Atik decided this wasn't for him after all, and he left quickly. Kwan, Hassan, and Khan stayed through the training. But as of November of 2001, Taliban fell, and Lett stopped Kwan, Hassan, and Khan from going to Afghanistan, and they were disappointed. But Lett said, we're not sending you. Yes, it's true, Lett was fighting in Kashmir. But the point that Tamimi said, go to Lett to get the training, because you can't go fight. You can't go join the Mujahideen without training. Lett is the sunnah, the right path. But they never went to actually fight anywhere, did they? They never made it because Lett stopped them because the war had... At that point, it appeared that the war had ended. We know... When I look at it, and you say the whole term jihad, and it's a pejorative term in many instances when it refers to fighting for Islam against those enemies, but it also has the internal meaning of fighting for your own sense, fighting yourself type thing. That's not the one here, I'm pretty sure. Tamimi said that he was talking about fighting. But still, how does that from being advocacy of doing something to you concretely, with specificity, indicate to do something? I think that's the exact point, Judge. And when he spoke in public, he talked about jihad fighting on behalf of jihad, through jihad on behalf of Islam was a pinnacle of jihad, excuse me, a pinnacle of Islam. That was abstract advocacy. But saying, now, go now, fight in Afghanistan, go to Lett to get the... Well, that was the example I just gave you of a leader standing before an angry group, mad at Congress, on the mall in Washington and saying, go now, go down the street and fight like hell. It's the same as what you're saying. I am not... To me, it sounds the same. So if what you're advocating is a crime, then what I just said is a crime, maybe a crime. I take no position on what happens when a public speaker speaks on television to the world, as opposed to someone who knows that he's doing something illegal, because he says, turn off the phones, close the shades. I guess I don't understand how, right after 9-11, someone wanting to have this conversation, whether you think it's or not, you probably don't want everyone to know about it. I just am not getting how being discreet under the circumstances translates to specific knowledge that you have now crossed the line from Brandenburg to unprotected speech. Judge, I think that's a fair point. But the crossing the line, Brandenburg is an abstract advocacy, talking about the moral propriety of taking certain action. And there was certainly some part of what Tamimi says that could be moral propriety of taking the action. But he was talking specific, not abstract, go now, go to L.E.T. to get the training so you can fight in Afghanistan. That's not abstract, and it couldn't be more imminent. The risk of harm couldn't be more imminent. So then if somebody stood at the Washington Mall and said, go down the street and fight like hell, go now, I'll be there with you, what you're saying would make that a crime. That can't be the case, can it? Your Honor, I don't know the answer to that one. That's a set of facts that has all sorts of It sounds the same as what you just said. Did he know? Tamimi said, in order to go fight, go to this particular group, 10,000 miles away, go down the street to get training so that you can fight. And by the way, if one of you gets taken off the plane, the other should continue. But if the other one gets taken off, the other one should not continue. You can't be more concrete. Do you want to speak to how, because I think solicitation and aiding and abetting are different in that solicitation might have a lower threshold to make it a crime. Would you like to address solicitation specifically? Well, I think the Supreme Court has said that solicitations to engage in unlawful activity are categorically excluded from protection. I'm sorry. In Williams, the Supreme Court said that we hold that offers to provide or request to obtain child pornography are categorically excluded from the First Amendment. So if you're requesting someone to provide you with child pornography, that's categorically excluded. I don't think it's any different if you're requesting child pornography or if you're requesting someone to go fight against the United States. It's categorically excluded. Solicitation is count two, right? Correct. Okay. So just as long as we're talking about count two. Do you have an explanation you want to give me about the briefing on this argument that levying war doesn't constitute categorically a crime of violence because it can be committed through nonviolent means like logistical support? I just, I mean, I'm assuming the government had some strategic reason why they didn't want to address that argument. Not at all, Judge. What went wrong here? I counted up the issues that were raised in this brief. So this was just a mistake? I misunderstood what their argument was. How could you have misunderstood? I just, I'm sorry. I assumed it was strategic. It's four pages. They don't argue divisibility. It's four pages arguing it's not a crime of violence because it doesn't categorically involve the use of force. And then it's not like you just missed it. You just complete, not you personally, but the brief. No, it was me personally. It was me personally. But the brief just totally mischaracterizes what they, it just doesn't seem like a mistake. I couldn't believe, excuse me, I did not believe that they were really saying that levying war does not threaten violence. I thought they must be saying something else. Well, they have this argument that you can do it through logistical support. And I mean, let's be honest, our categorical approach to crimes of violence, it leads to counterintuitive results in a lot of cases. That was my error. Okay, so why isn't the argument just abandoned? It's not in your brief. I don't, you want to make it now, I guess. Well, A, the district court found that it was in fact a crime of violence. We believe the district court was correct. We believe you can't have levying war without threatening violence. And that, again, it seems so obvious that I didn't think that could be their argument, that you could be levying, you could be. Well, do you want to respond to their argument now that you could be convicted of levying war through something like providing logistical support, which doesn't? But the levying war in itself is threatening violence. That's what war is. You can't be involved in levying war without being involved in threatening violence. I was in the Army, I was a JAG officer. Still, I thought I was part of the Army defending the United States in case of a war. If the court is going to hold that levying war is not a crime of violence, you know, I can't do anything about that. Well, you could brief it. The government's argument is that levying war obviously includes violence or the threat of violence. And to argue otherwise just doesn't make any sense. But it was my error and it was no one else's error. I've been on this case for over 20 years and there were many issues in this case over the last 20. Very few of them are the ones that we're now talking about. But I missed that one among the myriad issues in this brief. Thank you. You, Judge, gave an example, a very general example. And at least from that perspective, in her example, if someone was to do that, so go do something and then a crime occurred, in that instance the criminal conduct or what actually happened was much closer than in this case. It didn't happen immediately. It took time for it to happen. And we have explained on the Fourth Circuit that mere encouragement or lawlessness does not amount to an unprotected activity. In particular, I point you to the Williams case. Interesting enough, the United States Supreme Court makes a statement that the statement, I encourage you to attain child photography, is not unprotected speech. I mean, it's protected. That sounds strange to me, but it also puts it in the context of what happened here. And I mean, in the context of what was going on in 9-11 during that time period, we looked at the, I mean, the tensions were tremendous and I mean, it was just horrible. And it still is, you know, to think that someone would do or incite or take some activity in it. But it seems to me, if this gentleman is guilty under this, there are probably thousands and thousands in this country and around the world who could be, well, certainly around the world, but in this country, who probably did much more than this. And, you know, I think that's the core of where we are today, is a question, it's not a question of, well, do we think levy war is, the argument is made there. And the point that Judge Harris makes is when you make arguments to this court, you need to respond to them, because there's such a thing called waiver. You don't want to waive something like that. But let me tell you something, I really appreciate your candor and how you responded to that. You didn't duck that question. You didn't blame anybody else. You took that hit straight forward on that, and then you proceeded to go with it, in a way, as they say, common sense probably says it's not. So appreciate that aspect of it. But I think the focus, at least from here, that I've looked at the case, it looks like the First Amendment is at play here in the first instance. Unless you fit within one of those two unprotected categories that seem to be before us, then it's protected speech. And the Fourth Circuit has said mere advocacy does not amount to it. The Williams case gives that, what I think is an extreme example of it. But how do you, and maybe that's what the question has all been today, the difference of opinion as to whether this was just mere advocacy. And there is the element of remoteness to it. There's the element that it did not culminate in these men doing anything. They didn't fight. They didn't actually do it. There's also the element that when they were meeting and discussed the logistics of it, he wasn't there. He had left the room, maybe intentionally. I mean, they're savvy now. I mean, to turn off the phone and to close the windows and doors is savvy, but also kind of, probably everybody ought to do that in this day and age, because if you leave that phone on with that message the whole bit, who knows who's listening? And people were listening. So you like to have privacy to be able to speak in a manner that maybe it allows you discussion on it. And I don't, you know, this is close. It chills speech in a way that it gets close to, well, something happens and we're afraid this is going to happen, but nothing happened. So, Judge, I would like to point, to respond by pointing to this court's decision in Rice versus Paladin Enterprises, where the court sketched out the difference, maybe the fine line, between advocacy that's protected and advocacy that's not protected. And the examples that were given in citing to the different Supreme Court cases over the years was theoretical advocacy is protected, and the advocacy of principles divorced from action is protected, and doctrinal justification is protected, and the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence is protected. But the advocacy and teaching of concrete action is not protected, and the preparation for violent action is not protected, and the stealing for violent action is not protected. And that's what happened here. It was stealing the others for violent action. Yes, it was advocacy, but it wasn't abstract. It wasn't, there was an element certainly of the moral necessity for it. That's true. But there was also the practical, discreet, go to Lashkar-e-Taiba to get the training so that you can go now, you don't have to tell your parents about it, you don't have to pay your debts before you go, and if one of you gets taken off the plane, the other one should continue. So these are, by the standards in Paladin Enterprises of what's protected versus what's not protected, this was not protected. I know. Well, just thank you. Okay. Thank you, Mr. Croninger. Thank you for your honor. Mr. Kagan, you have a few minutes. I just have three points. Your honor, first responding to the point about a go through Royer, the statement made by Mr. Altamimi on September 16th. Aitik had already gone through Royer. He had a ticket. He had a letter of introduction from Mr. Royer. Quan, on JA 1325, said almost a year before he had already been recruiting for Mr. Royer. Mr. Hassan, on JA 2246, said he knew that Randall Royer was encouraging people to go to Pakistan and serve with Lashkar-e-Taiba. All of these individuals knew Royer. They knew that he was the person, the contact person. It was not Dr. Altamimi who connected them with Mr. Royer. But Appellant was a teacher and a leader in their eyes, in terms of at the mosque, he was the leader. I would say he's a teacher. Okay. Well, he was a teacher. He told them that they were religiously required to go and get this LIT training and fight the Taliban. How is that not solicitation? What he said was there is a moral obligation to assist Muslims who are under attack. That's just Muslim just war theory. Saying that is not a crime. It is talking about a moral obligation. And one of the cases cited in Brandenburg is a case called Noto, where the Supreme Court said encouraging or persuading someone based on their moral obligation, that is not criminal. Now, with respect to specificity... It feels as though he might have thought it was criminal since he closed the blinds and had everybody turn their phones off and had one person he didn't know leave the room before he told them all this. So this was in the context of a real concern about surveillance and attacks on Muslim individuals, retaliation in the wake of 9-11. And so I think it's very clear in the record that these individuals were afraid for themselves and for their families. And so avoiding surveillance, I think that's what the consequence of that sense was. With respect to specificity, my friend says Brandenburg or the First Amendment doesn't protect anything but abstract advocacy. But I would point to the same decision that Judge Wynn pointed, U.S. v. Williams, in which the Supreme Court said, I encourage you to obtain child pornography. That that is abstract encouragement. That is not the specificity that renders someone subject to prosecution for solicitation, because it is just general advocacy. And so if my friend is correct that Dr. Al-Tamimi said you should go overseas and defend Muslims in Afghanistan, that is equivalent to what the Supreme Court said is by the First Amendment in Williams. The third point, with respect to Judge Thacker, to your example of January 6th, the difference between January 6th and the charge or the conduct in this case is the imminence with which the individuals were directed to engage in action. And so there's actually a D.C. Supreme District Court case that analyzes Brandenburg in connection with that conduct. And that is very different from what we have here, which is individuals meeting and told you should go overseas at some point in the future and you should train with L.E.T. Almost the entire scholarship that we've cited on page 96 of our opening brief in a footnote lists all of the articles that analyze this under Brandenburg and say this is not what incitement is. Incitement is the immediate direction for individuals to engage in violent action. That's all I have. I'm happy to talk about levying war. I think it's, I appreciate my friend's concession on that. I also think that counterintuitively the law is very clear, both under English law and American law, that assembly does not require the expression of a threat. It can be done secretly and you can still violate the statute. It also doesn't require an attack. It's very clear. For all of the reasons that we have articulated and that are in our brief, we ask this court to vacate all of the convictions and remand for judgments of acquittal. Thank you. Thank you. Thank you, Mr. Cohen, for your argument and recognizing you've been assigned to this case by the court and the Federal Public Defender's Appreciate your service and Mr. Kronberg, I appreciate your advocacy over 20 years on a case here. That seems to be a long time to hold on to a case. You probably know more about this case than almost anybody out there other than the actual defendants in this case. So we will adjourn court for the week and for the time that we're here and I'll come down and greet counsel. This honorable court stands adjourned sign and die. God save the United States and this honorable court.
judges: James Andrew Wynn, Stephanie D. Thacker, Pamela A. Harris